**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **THE PRUDENTIAL INSURANCE COMPANY** | ) | |
| **OF AMERICA** | ) | |
| **751 Broad Street** | ) | |
| **Newark, NJ 07102** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 07-C-6868** |
| | ) | **Hon. Ruben Castillo** |
| **CLARK CONSULTING, INC.** | ) | |
| **102 South Wynstone Park Drive** | ) | |
| **North Barrington, IL 60010** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

Donald J. Munro
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, D.C. 20001
Telephone 202-346-4137
Facsimile 202-346-4444

Daniel J. Mohan
William J. McFadden
DALEY MOHAN GROBLE, P.C.
55 West Monroe, Suite 1600
Chicago, IL 60603
Telephone: 312-422-9999

ATTORNEYS FOR THE PRUDENTIAL
INSURANCE COMPANY OF AMERICA

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ............................................................................................ 1

FACTUAL BACKGROUND ............................................................................3

ARGUMENT ....................................................................................................5

     I.    The Standard for Summary Judgment ........................................................5

     II.   The Governing Principles of Illinois Contract Law....................................6

     III.  The Applicable Contracts Plainly Provide that Prudential is Entitled to
            Payment From Clark ...................................................................................7

          A.  Prudential Was Entitled to Terminate the PIMS Agreement at Any Time ...........7

          B.  Termination of the PIMS Agreement Gives Rise to a Right to Payment
               Under Section 5.0 of the Marketing Agreement .....................................9

          C.  Termination of the PIMS Agreement is Distinct From a Decision Not to
               Participate in Conferences for Prudential's Own Convenience............................12

CONCLUSION...............................................................................................14

## TABLE OF AUTHORITIES

**CASES:**                                                                                                                    **Page**

*A.W. Wendell & Sons v. Qazi*, 254 Ill. App. 3d 97, 626 N.E.2d 280 (2ᵈ Dist. 1993) .....................6

*Alderman Drugs, Inc. v. Metropolitan Life Ins. Co.*, 161 Ill. App. 3d 783,
515 N.E.2d 689 (1ˢᵗ Dist. 1987) ........................................................................8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................5

*Benedict v. Federal Kemper Life Assurance Co.*, 325 Ill. App. 3d 820,
759 N.E.2d 23 (1ˢᵗ Dist. 2001) ........................................................................ 6-7

*Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*,
212 F.3d 373 (7ᵗʰ Cir. 2000) ...........................................................................6

*Continental Cas. Co. v. LaSalle Re Ltd.*, 511 F. Supp. 2d 943 (N.D. Ill. 2007)...........................6

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376 (7ᵗʰ Cir. 2003)...........................6, 9

*Dace Int'l, Inc. v. Apple Computer, Inc.*, 275 Ill. App. 3d 234, 655 N.E.2d 974
(1ˢᵗ Dist. 1995) ........................................................................................11

*Emergency Med. Care, Inc. v. Marion Mem'l Hosp.*, 94 F.3d 1059 (7ᵗʰ Cir. 1996).......................6

*Insignia/Frain Camins & Swartchild v. Querrey & Harrow, Ltd.*, 36 F. Supp. 2d 1051
(N.D. Ill. 1999).........................................................................................6

*Jespersen v. Minnesota Mining & Mfg. Co.*, 288 Ill. App. 3d 889, 681 N.E.2d 67
(1997), *aff'd*, 183 Ill. 2d 290, 700 N.E.2d 1014 (1998)......................................................9

*Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997 (7ᵗʰ Cir. 2000) ....................................5

*Molex Inc. v. Wyler*, 365 F. Supp. 2d 901 (N.D. Ill. 2005 ).............................................5

*Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560 (7ᵗʰ Cir. 1995)....................................2

*Northern Trust Co. v. VIII South Michigan Assocs.*, 276 Ill. App. 3d 355,
657 N.E.2d 1095 (1ˢᵗ Dist. 1995) ......................................................................8

*Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 618 N.E.2d 418
(1ˢᵗ Dist. 1993) ........................................................................................8

*USG Interiors, Inc. v. Commercial & Architectural Prods., Inc.*,
241 Ill. App. 3d 944, 609 N.E.2d 811 (1ˢᵗ Dist. 1993).....................................................6

**<u>RULES</u>:**

Fed. R. Civ. P. 56(c) ....................................................................................................5

## INTRODUCTION

This case concerns a contract dispute between The Prudential Insurance Company of America ('Prudential"), an issuer of group life insurance policies, and Clark Consulting, Inc. ("Clark"), a broker that sells insurance to third parties.  There are two separate agreements between Prudential and Clark at the center of this dispute:  (1) a broker-dealer agreement known as the "PIMS Agreement," and (2) an agreement whereby Prudential prepaid for marketing services by Clark, known as the Prepaid Marketing Meeting Expense Agreement ("Marketing Agreement").  In late 2006, after Prudential cancelled the PIMS Agreement, it sought payment of $3,241,000 from Clark pursuant to a "failed expectations" clause in the Marketing Agreement. Clark refused payment, giving rise to this action.

The central issue here is a straightforward question of contract interpretation:  did Prudential's termination of the PIMS Agreement give rise to a right to payment under the Marketing Agreement?  Resolution of this matter turns on the meaning of two interrelated sections of these agreements.  First, Section 5.0 of the Marketing Agreement provides that if it is "impossible" for Prudential to participate in marketing conferences hosted by Clark, then Clark shall pay compensation for Prudential's "failed expectations."  Section 5.0 expressly defines "impossible" to include, *inter alia*, termination of the PIMS Agreement.  Section 13 of the PIMS Agreement provides, in turn, that "[e]ither party may terminate this Agreement at any time by giving the other party notice thereof in writing."  Relying on the plain and unambiguous terms of these two provisions, Prudential contends that (1) it was entitled to terminate the parties' broker-dealer relationship at any time, and (2) that doing so triggered the "failed expectations" clause in Section 5.0 of the Marketing Agreement.  Thus, Prudential is – based on the four corners of the applicable agreements – clearly entitled to payment from Clark.

Clark's contrary interpretation is flatly inconsistent with the plain language of the agreements and the relevant principles of Illinois contract law. First, Clark argues that Prudential breached the "implied duty of good faith and fair dealing" by terminating the PIMS Agreement. But it is well settled that the implied duty of good faith cannot override or modify an express right of both parties to a contract to terminate at "any time." Second, Clark contends that termination of the PIMS Agreement does not trigger Section 5.0 of the Marketing Agreement because it allows Prudential to "create" its own impossibility. That simply denies that Section 5.0 means what it says. It clearly defines "impossible" to include termination of the PIMS Agreement, without qualification or limitation. Finally, Clark relies on the provision in Section 5.0 which states that "[i]mpossible shall not include a decision by Prudential not to participate for purposes of its own convenience." But Prudential did not merely decide not to participate in the marketing conferences – it terminated the parties' entire broker-dealer relationship, which it was entitled to do at any time. In short, because Prudential's interpretation is the only interpretation that is consistent with the plain language, it must prevail.

This issue of contract interpretation can and should be decided as a matter of law. *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 564-65 (7th Cir. 1995) ("Summary judgment is particularly appropriate in cases involving the interpretation of contracts.") (citation omitted). To be sure, resolution of this question may not dispose of this case in its entirety. Clark has also raised defenses concerning its right to terminate the Marketing Agreement, which we do not address herein. But a ruling that settles the meaning of the key contract provisions will, at a minimum, substantially narrow the scope of this case.

Prudential has complied with the rules of this Court by serving a letter on opposing counsel in an effort to resolve the need for this motion, prior to filing.

FACTUAL BACKGROUND

While the parties dispute various facts concerning the performance of the Marketing Agreement – and in particular whether Clark was entitled to terminate that Agreement for cause – there is no dispute about the terms of the relevant agreements for purposes of Prudential's claim of breach of contract. Those undisputed facts are set forth in the accompanying Statement of Undisputed Material Facts ("Statement"). In summary form, the undisputed facts are as follows:

1.      On September 26, 2000, Prudential Investment Management Services ("PIMS"), an affiliate of Prudential, entered into a broker-dealer agreement with Clark Securities, Inc. ("CSI"), an affiliate of Clark. This agreement was known as the PIMS Agreement. Answer ¶ 7. *See also* Statement Exhibit A.

2.      The PIMS Agreement established the terms under which Clark would sell Prudential COLI contracts to third-parties. Compl. ¶ 8; Answer ¶ 8. It provided that if Clark sold a Prudential insurance policy that was subsequently returned by the purchaser, Clark would be required to repay to Prudential any commissions paid on the sale of that policy. Exhibit A at 5; Answer ¶ 8. In addition, Section 13 of the PIMS Agreement, entitled "Termination," provides in pertinent part as follows:

> "Either party may terminate this Agreement at any time by giving the other party notice thereof in writing, termination to be effective 30 days after receipt of such notice."

Exhibit A at 10; Answer ¶ 9.

3.      After entering into the PIMS Agreement, CSI procured a third party, Allmerica, as the purchaser of Prudential Group COLI contracts. Answer ¶ 10. Prudential paid commissions to Clark for that sale. *Id.* However, on October 31, 2003, Allmerica tendered its

COLI contracts for surrender. Answer ¶ 11. As a consequence of Allmerica's surrender of its contracts, Clark was obligated to repay to Prudential an amount equal to the unearned commissions. Answer ¶ 12.

4.      The parties agreed to seek an alternative to repayment of the commissions on the Allmerica contracts, and ultimately entered into a new agreement known as the Prepaid Marketing Meeting Expense Agreement (the "Marketing Agreement"). Answer ¶¶ 13-14. *See also* Statement Exhibit B. The Marketing Agreement provided, *inter alia*, for a waiver by Prudential of the Clark obligation to pay the amount due with respect to the surrender of Allmerica Group COLI contracts. In exchange, Clark granted to Prudential a "$3.5 million Marketing Meeting Expense Allowance." Exhibit B § 1.0.2; Answer ¶ 15.

5.      Section 5 of the Agreement, entitled "Compensation for Prudential's Failed Expectations," provides in pertinent part as follows:

> "5.0.1  In the event that some or all of the Conferences are discontinued without successors or *in the event that it becomes otherwise impossible for Prudential to participate in some or all of the Conferences, Clark Consulting shall pay Prudential compensation as determined under Section 5.0.2 for its failed expectations*.
>
> *'Impossible' shall mean any of the following*:  (a) Prudential is unable to participate because of circumstances beyond its control; (b) *the PIMS Agreement (which is being amended and restated contemporaneously with the execution of this Agreement) has been terminated*; or (c) Prudential has withdrawn from the COLI business.  Impossible shall not include a decision by Prudential not to participate for purposes of its own convenience.
>
> 5.0.2  In the event of Prudential's failed expectations under Section 5.0.1, Clark Consulting shall pay Prudential an amount equal to the Unused Marketing Meeting Expense Allowance. The Unused Marketing Meeting Expense Allowance is defined as the Marketing Meeting Expense Allowance reduced by the cumulative amount of Conference Fees waived."

Exhibit B § 5 (emphasis added). *See also* Compl. ¶ 17; Answer ¶ 17.

6.       On December 1, 2006, PIMS sent a letter to Clark terminating the PIMS Agreement pursuant to Section 13 of that Agreement, effective December 31, 2006.  Answer ¶ 19.  Thereafter, on December 19, 2006, Prudential notified Clark in writing that, in light of the termination of the PIMS Agreement, it was invoking Section 5.0 of the Marketing Agreement.  Answer ¶ 21.  Prudential requested payment of $3,241,000.  *Id.*

7.       Clark refused – and continues to refuse – Prudential's demand for payment under Section 5.0 of the Agreement.  Answer ¶¶ 22, 24.

ARGUMENT

**I.     The Standard for Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Accordingly, the non-movant must "come forward with specific facts showing that there is a genuine issue for trial."  *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000) (internal citations omitted).

It is well settled that "[m]atters of contract interpretation are squarely within the court's competency, and thus often lend themselves to resolution at the summary judgment stage."  *Molex Inc. v. Wyler*, 365 F. Supp. 2d 901, 908 (N.D. Ill. 2005 ) (Castillo, J.) (citing *Tingstol Co. v. Rainbow Sales Inc.*, 218 F.3d 770, 771 (7th Cir. 2000)).  "Under Illinois law, contract interpretation – including the question of whether or not a contract is ambiguous – is a legal question for the courts to determine."  *Molex*, 365 F. Supp. 2d at 908 (collecting cases).

## II.    The Governing Principles of Illinois Contract Law

Under Illinois law, the purpose of contract interpretation is to discover and give effect to the mutual intent of the parties.[1]  *See, e.g.*, *Continental Cas. Co. v. LaSalle Re Ltd.*, 511 F. Supp. 2d 943, 947 (N.D. Ill. 2007) (Castillo, J.) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 966 (Ill. App. Ct. 2004)).  The best evidence of what parties intend is what they say in the written agreement itself.  *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 378 (7th Cir. 2000) (applying Illinois law).  Indeed, where the language of a contract is clear and unambiguous, the trier of fact should construe and discern the parties' intent *solely* from the agreement's terms:

> "An agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it.  It speaks for itself, and the intention with which it was executed must be determined from the language used.  It is not to be changed by extrinsic evidence."

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003) ("*AB Volvo*") (citing and applying Illinois law).[2]

A contract is considered "unambiguous" if it is not reasonably susceptible to differing interpretations when read according to its plain language and in light of the circumstances in which it was written.  *A.W. Wendell & Sons v. Qazi*, 254 Ill. App. 3d 97, 112-13, 626 N.E.2d 280, 292 (2d Dist. 1993).   In other words, the threshold determination of ambiguity is itself dependent solely on an analysis of the language of the agreement.  *See Benedict v. Federal*

---

[1]    The Marketing Agreement expressly states that it is governed by Illinois law.  Statement Exhibit B at 8.

[2]    *See also, e.g., Emergency Med. Care, Inc. v. Marion Mem'l Hosp.*, 94 F.3d 1059, 1060-61 (7th Cir. 1996) ("If the language unambiguously answers the question at issue, the inquiry is over.") (citations omitted); *Insignia/Frain Camins & Swartchild v. Querrey & Harrow, Ltd.*, 36 F. Supp. 2d 1051, 1053-54 (N.D. Ill. 1999) ("When the language in the contract is clear and unambiguous our inquiry ends because we must give effect to contracts as written."); *USG Interiors, Inc. v. Commercial & Architectural Prods., Inc.*, 241 Ill. App. 3d 944, 948, 609 N.E.2d 811, 814 (1st Dist. 1993) (court must "derive the parties' intent and the meaning of the instrument solely from the writing itself").

*Kemper Life Assurance Co.*, 325 Ill. App. 3d 820, 823, 759 N.E.2d 23, 26 (1ˢᵗ Dist. 2001)

("Illinois law follows the 'four-corners' rule in contract interpretation and looks only 'to the

language of the contract to determine if it is susceptible to more than one meaning.'" ).

**III.    The Applicable Contracts Plainly Provide That Prudential is Entitled to Payment From Clark.**

In this case, the relevant agreements are plain and unambiguous, and Prudential's

interpretation is the only reasonable reading of those contracts.  In this Part, we show, first, that

the right to terminate the PIMS Agreement was unqualified and hence cannot be modified by the

"implied duty of good faith and fair dealing."  Next, we demonstrate that cancellation of the

PIMS Agreement is one of the triggers for invoking Section 5.0 of the Marketing Agreement.

Finally, we rebut Clark's suggestion that Prudential's right to demand payment under Section 5.0

upon termination of the PIMS Agreement is undercut by the "convenience" clause at the end of

Section 5.0.1.

*A.    Prudential Was Entitled to Terminate the PIMS Agreement at Any Time.*

The PIMS Agreement established a complex and open-ended broker-dealer relationship

between PIMS and Clark Securities.  *See* Statement Exhibit A.  The Agreement is quite clear

about how and when this broker-dealer relationship may be severed.  Section 13 of the PIMS

Agreement, entitled "Termination," states in pertinent part as follows:

> "*Either party may terminate this Agreement at any time* by giving the other party
> notice thereof in writing, termination to be effective 30 days after receipt of such
> notice."

*Id.* at 10 (emphasis added).

There is no ambiguity in this language.  A termination provision which states that an

agreement may be terminated "at any time" means exactly that – either party is free to end the

contract at-will, for any reason or no reason.[3]  *E.g.*, *Alderman Drugs, Inc. v. Metropolitan Life Ins. Co.*, 161 Ill. App. 3d 783, 790, 515 N.E.2d 689, 694 (1st Dist. 1987) (agreement permitting either party to terminate upon thirty days' written notice is terminable at-will, and thus "permit[s] termination for any reason, good cause or not, or no cause at all").

Nevertheless, Clark denies that "PIMS had the right to terminate the PIMS Agreement" and insists that the "unilateral termination of the PIMS Agreement" was not valid or effective. Answer ¶¶ 19-20; *see also* Answer ¶ 1.  Its contention on this point is not based on any alternative interpretation of Section 13, but rather relies on the proposition that "Prudential breached the implied duty of good faith and fair dealing by its conduct in instigating the unilateral termination of the PIMS Agreement as a means of escaping its obligations under the Marketing Agreement."  Counterclaim ¶ 27.

That is not so.  Under Illinois law, the implied covenant of good faith and fair dealing applies when only one party to a contract is given broad discretion in its performance, but not if both parties are afforded the same discretion.  *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 618 N.E.2d 418 (1st Dist. 1993).  Moreover, the implied duty of good faith does not apply if contract's plain terms address the subject in question.  *Northern Trust Co. v. VIII South Michigan Assocs.*, 276 Ill. App. 3d 355, 367, 657 N.E.2d 1095, 1104 (1st Dist. 1995).  Thus, "the duty of good faith and fair dealing does not override the clear right to terminate at will, since no obligation can be implied which would be inconsistent with and destructive of the unfettered

---

[3]     Because the PIMS Agreement does not require a reason for termination, Prudential's reasons for cancelling it are really beside the point.  But to the extent that it makes any difference, Prudential cancelled the parties' broker-dealer relationship after it learned that its broker, Clark, was being acquired by an insurance company that sells the exact same COLI products offered by Prudential.  Compl. ¶ 19.  *See also* Answer ¶ 6 (admitting that Clark was acquired by AEGON USA).  Prudential was concerned that this would undermine Clark's interest in promoting Prudential's products (just as Coca-Cola might become concerned if one of its distributors were purchased by Pepsi).

right to terminate at will." *Jespersen v. Minnesota Mining & Mfg. Co.*, 288 Ill. App. 3d 889, 896, 681 N.E.2d 67, 71 (1997), *aff'd*, 183 Ill. 2d 290, 700 N.E.2d 1014 (1998).

The Seventh Circuit summarized these points in *AB Volvo*, a case applying Illinois law. In that case, the contract at issue provided that it "may be terminated at any time by either party without cause by giving at least sixty days written notice to the other party." 349 F.3d at 394. The Court of Appeals rejected the argument that a termination of such a contract could violate the implied covenant of good faith:

> "[T]he contracts very clearly give the right to terminate without cause on sixty days' notice to both parties. There is no ambiguity and the provision does not vest a single party with discretion but rather grants both parties the unfettered right to terminate. Illinois law holds that parties to a contract are entitled to enforce the terms to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract."

*Id.* at 395-96.

The same is true here. Both parties – not just Prudential – had the right to terminate the broker-dealer relationship "at any time." Statement Exhibit A at 10. Moreover, because an unfettered right to terminate is express in the PIMS Agreement, it cannot be modified or overridden by an implied duty to refrain from termination for certain reasons or upon certain terms or conditions.

> B.    *Termination of the PIMS Agreement Gives Rise to a Right to Payment Under Section 5.0 of the Marketing Agreement.*

Once it is established that Prudential properly terminated the PIMS Agreement, the next question is whether such termination can serve as a basis for invoking the "failed expectations" provisions in the Marketing Agreement.  Those provisions, found in Section 5.0 of the Marketing Agreement, obligate Clark to pay Prudential "an amount equal to the Unused Marketing Meeting Expense Allowance," as defined therein, in the event that the conferences are

discontinued or if "*it otherwise becomes impossible* for Prudential to participate in some or all of the Conferences." Statement Exhibit B § 5.0.1 (emphasis added).

The parties carefully defined what they meant by "impossible" in this context. There are three specific circumstances that encompass "impossibility," and one of those three circumstances is termination of the PIMS Agreement:

> "'Impossible' shall mean any of the following: . . . (b) the PIMS Agreement . . . has been terminated."

*Id.* The proper interpretation of this language is clear and straightforward. If the PIMS Agreement "has been terminated," then it is "impossible" for Prudential to participate in the conferences and "Clark Consulting shall pay Prudential compensation." *Id.* Indeed, this is the *only* reasonable interpretation of the Agreement in light of its plain language.

Clark, to be sure, denies that this is so. *See* Answer ¶ 20. It insists that a "unilateral termination" of the PIMS Agreement by Prudential cannot constitute a basis for invoking Section 5.0 of the Marketing Agreement because this would permit Prudential "to create its own 'impossibility.'" Counterclaim ¶ 24. *See also* Answer ¶ 19 (denying that parties intended to permit a "self-induced 'impossibility' under the Marketing Agreement").

This is, however, simply a denial that the language of Section 5.0 means what it plainly says. The parties could have chosen any number of different formulations of contract language to prevent Prudential from seeking compensation under Section 5.0 after a unilateral decision to terminate the PIMS Agreement. They could have, for example, required a mutual termination of the PIMS Agreement. They could have specified that Section 5.0 would apply only upon a termination of the PIMS Agreement for good cause. They could have tied the meaning of "impossible" to some other criteria entirely. But they did not do so. They clearly said that if the

PIMS "has been terminated" – without qualification – then Section 5.0 applies and Clark "shall pay" compensation to Prudential, period.

It seems that Clark's argument about "created" or "self-induced" impossibility rests on a belief that it is not fair for Prudential to have so much *de facto* control over whether Section 5.0 could be invoked. Clark complains that Prudential should not be allowed to "escape its agreed upon obligations under the Marketing Agreement" in this fashion. Answer ¶¶ 19, 20. Indeed, it goes so far as to suggest that Prudential's reading of Section 5.0 renders the contract "illusory." Counterclaim ¶ 25.

The short and sufficient answer to such an argument is that Clark is sophisticated entity and is responsible for the content of its own agreements. *See, e.g.*, *Dace Int'l, Inc. v. Apple Computer, Inc.*, 275 Ill. App. 3d 234, 240, 655 N.E.2d 974, 978 (1st Dist. 1995) ("We decline to remedy [plaintiff's] failure or inability to object to the clause at the time of contracting, and see no reason to release a sophisticated corporate entity from the consequences of its bargain."). The fact that Clark may now wish that it had agreed to tighter restrictions on Prudential's right to cancel is not a basis for refusing to enforce those agreements as written.

In any event, it actually makes perfect sense that the parties structured the agreements in this fashion, giving Prudential the right to terminate the Marketing Agreement if it determined that the underlying broker-dealer relationship was not working. As the Marketing Agreement's recitals indicate, the Agreement arose from the fact that Clark owed a substantial amount of money to Prudential. Statement Exhibit B at 1. By entering into this Agreement, Prudential was, in effect, prepaying for Clark's marketing services. *See* Answer ¶ 15. And like any purchaser who has advanced a substantial sum for future services, Prudential had every reason to insist upon a means by which it could recover at least a portion of its advance payment if it became

dissatisfied with the parties' relationship.   There is nothing strange, unfair, or "illusory" about such an arrangement.

> C.     *Termination of the PIMS Agreement Is Distinct From a Decision Not to Participate in Conferences for Prudential's Own Convenience.*

Clark also contends that the Marketing Agreement does not permit Prudential to demand payment under Section 5.0 if it instigates termination the PIMS Agreement "for its own convenience." *See* Counterclaim ¶ 19.  In making this argument, Clark is pointing to the last sentence of Section 5.0.1, which states that "[i]mpossible shall not include a decision by Prudential not to participate for purposes of its own convenience."  Statement Exhibit B § 5.0.1.

That is not a viable reading of the plain language.  The terms of Section 5.0.1 expressly distinguish between (1) a termination of the PIMS Agreement, thereby ending the parties' underlying broker-dealer relationship (which does trigger a right to payment), and (2) a decision not to participate in conferences (which does not trigger a right to payment).  Terminating the whole relationship is clearly different than just not participating in the conferences.  The Marketing Agreement allows Prudential to demand payment only if it was willing to end the parties' entire relationship.  And that is exactly what happened.  Prudential did not merely refuse to attend conferences "for purposes of its own convenience" – it determined that the entire affiliation with Clark was unworkable.  Having taken that step, severing the entire partnership, Prudential obviously could not be expected to nevertheless continue to attend conferences, and so is now entitled to payment under Section 5.0.

By contrast, Clark's interpretation requires rearranging the words of the Marketing Agreement.  It seeks, in essence, to insert the "convenience" clause found in the last sentence of Section 5.0.1 into the preceding sentence, in order to create a new and different provision that would read something like this:

"'Impossible' shall mean any of the following:  (a) Prudential is unable to participate because of circumstances beyond its control; (b) the PIMS Agreement (which is being amended and restated contemporaneously with the execution of this Agreement) has been terminated, *unless Prudential does so for purposes of its own convenience*," (c) . . . ."

Of course, the plain language of the Agreement does *not* read that way, and so Clark's interpretation must be rejected.[4]

In short, the plain meaning of the "convenience" clause is that Prudential could not demand payment simply because it could not be bothered to participate in marketing conferences offered by Clark.  Because Prudential instead undertook the much broader and more significant step of terminating the entire broker-dealer relationship, it is entitled to payment from Clark under Section 5.0.

---

[4]    Even if Section 5.0 of the Agreement did read that way, Prudential would contend that it did not terminate the PIMS Agreement "for purposes of its own convenience," but rather did so for valid business reasons.  *See infra* Note 3.

CONCLUSION

For the foregoing reasons, this Court should grant partial summary judgment in favor of

Prudential and against Clark on Count One of the First Amended Complaint.

Respectfully submitted,

ATTORNEYS FOR THE PRUDENTIAL
INSURANCE COMPANY OF AMERICA

/s/ Donald J. Munro
Donald J. Munro
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, D.C. 20001
Telephone: 202-346-4137
Facsimile: 202-346-4444

/s/ Daniel J. Mohan
Daniel J. Mohan
DALEY MOHAN GROBLE, P.C.
55 West Monroe, Suite 1600
Chicago, IL 60603
Telephone: 312-422-9999
Attorney No. 6187721

/s/ William J. McFadden
William J. McFadden
DALEY MOHAN GROBLE, P.C.
55 West Monroe, Suite 1600
Chicago, IL 60603
Telephone: 312-422-9999
Attorney No. 6276661

March 17, 2008

## <u>CERTIFICATE OF SERVICE</u>

I, William J. McFadden, an attorney, state that on March 17, 2008, I served true and correct copies of the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** upon the following attorneys of record via the Court's CM/ECF filing system and by U.S. Mail by depositing the same in the U.S. Post Office box located at 55 West Monroe, Chicago, Illinois:

Dale G. Markland, Esq.
Tara E. Hanley, Esq.
MARKLAND HANLEY LLP
2200 Ross Avenue, Suite 4100W
Dallas, TX 75201

Gregory Robert James, Jr., Esq.
Thomas Stephen Bradley, Esq.
LANER, MUCHIN, DOMBROW, BECKER
515 North State Street, Suite 2800
Chicago, IL 60610

/s/ William J. McFadden
William J. McFadden
DALEY MOHAN GROBLE, P.C.
55 West Monroe, Suite 1600
Chicago, IL 60603
Telephone: 312-422-9999
Facsimile:  312-422-5370
Attorney No. 627661